**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| LOUISIANA FAIR HOUSING ACTION CENTER, INC. | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 2:20-2339 |
| PLANTATION MANAGEMENT LLC, ST. JOSEPH OF HARAHAN, L.L.C., HIGHPOINT HEALTHCARE LLC, MEDICO LLC, NOTRE DAME HEALTH SYSTEM, COMMCARE CORPORATION, COMMCARE MANAGEMENT CORPORATION, METARIE OPERATIONS, L.L.C., JEREMY GOUX, TIMOTHY GOUX, ST. JUDE MANAGEMENT #2, L.L.C., and LAWRENCE STANSBERRY, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES**

**PRELIMINARY STATEMENT**

1.    Plaintiff Louisiana Fair Housing Action Center, Inc. ("LaFHAC"), is a nonprofit entity with a mission to eradicate housing discrimination in Louisiana.  A multi-year investigation undertaken by LaFHAC has substantiated that Defendants, owner/operators of Assisted Living Facilities and Nursing Homes in Southeast Louisiana providing residential care, have engaged and continue to engage in discriminatory practices against individuals who are deaf.  These entities refuse to provide or adopt low-cost interpretive assistance necessary to enable effective

1

communication vital to deaf residents' and prospective deaf residents' care. Defendants have refused interpretive assistance notwithstanding receipt of generous federal funds that not only presume and require non-discrimination in services, but affirmatively mandate that necessary methods to enable effective communication be provided to deaf individuals.

2.      Plaintiff brings this lawsuit to compel Defendants to cease unlawful discriminatory practices and to implement policies and procedures that will ensure effective communication, a meaningful opportunity to participate in and benefit from Defendants' residential and health care services, and full and equal enjoyment of their residences. Plaintiff seeks declaratory, injunctive, and equitable relief, compensatory and punitive damages, and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of the Fair Housing Act ("FHA") of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.*, the Rehabilitation Act (the "Rehabilitation Act"), 29 U.S.C. § 794, Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, and Louisiana law.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over Plaintiff's claims arising under federal law pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. §§ 3613 and 12133, 42 U.S.C. § 18116, and 29 U.S.C. § 794 and supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in the United States District Court for the Eastern District of Louisiana under 42 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the Plaintiff's claims occurred there, and the properties that are the subject of this suit are located there.

5.      Declaratory and injunctive relief is sought pursuant to 42 U.S.C. §§ 3613(c)(1) and 12133, as well as Rules 57 and 65 of the Federal Rules of Civil Procedure.

## PARTIES

### Louisiana Fair Housing Action Center, Inc.

6.      Plaintiff LOUISIANA FAIR HOUSING ACTION CENTER, INC. ("LaFHAC") is a private, nonprofit fair housing advocacy organization with a mission to eradicate housing discrimination in Louisiana.

7.      LaFHAC seeks to promote equal housing opportunities, including housing opportunities in Nursing Homes and Assisted Living Facilities.  The organization advances its mission through a variety of activities, including education, outreach, counseling, investigation, advocacy, and enforcement.

8.      LaFHAC engages in testing and other investigations of allegations of housing discrimination.  Testing is a simulated housing transaction that evaluates a housing provider's treatment of individuals to determine if the provider is engaged in discriminatory housing practices.  It employs "testers," who pose as prospective residents, renters, and homebuyers to obtain information about the conduct of individuals and entities engaged in the provision of housing and related services for the purposes of investigating housing discrimination.  Testing as an investigative tool has long been utilized by the United States Department of Justice and fair housing organizations as an essential means to detect and confirm discriminatory practices that may go otherwise undetected.

9.      LaFHAC is an "aggrieved person" as defined by the Fair Housing Act, the Rehabilitation Act, and Section 1557 of the ACA.  LaFHAC brings this Action on its own behalf.

### St. Joseph of Harahan

3

10.     St. Joseph of Harahan is a nursing home and assisted living facility offering long-term residences with 206 or more beds located at 405 Folse Drive in Harahan, Louisiana.

11.     At all times relevant to the Complaint, Defendant PLANTATION MANAGEMENT LLC was an operating manager of St. Joseph of Harahan.

12.     At all times relevant to the Complaint, Defendant ST. JOSEPH OF HARAHAN, L.L.C. was an owner and operating manager of St. Joseph of Harahan.

13.     At all times relevant to the Complaint, Defendant HIGHPOINT HEALTHCARE LLC was an owner and an operating manager of St. Joseph of Harahan.

14.     At all times relevant to the Complaint, Defendant MEDICO LLC was an owner of St. Joseph of Harahan.

15.     At all times relevant to the Complaint, St. Joseph of Harahan offered long-term care for prospective residents and is a dwelling within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h).

16.     At all times relevant to the complaint, St. Joseph of Harahan and Defendants ST. JOSEPH OF HARAHAN, L.L.C., MEDICO LLC, HIGHPOINT HEALTHCARE LLC, and PLANTATION MANAGEMENT LLC engaged in a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

### Chateau de Notre Dame

17.     At all times relevant to the Complaint, Defendant NOTRE DAME HEALTH SYSTEM was an owner and/or operator of Chateau de Notre Dame, a Nursing Home and Skilled Nursing Facility with at least 171 beds located at 2832 Burdette Street in New Orleans.

18.     At all times relevant to the Complaint, Chateau Notre Dame offered long-term care for prospective residents and is a dwelling within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h).

19.     At all times relevant to the Complaint, Chateau de Notre Dame and NOTRE DAME HEALTH SYSTEM engaged in a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

## Greenbriar Community Care Center

20.     At all times relevant to the Complaint, Defendant COMMCARE CORPORATION was an owner, operator, or managing entity of Greenbriar Community Care Center, a skilled nursing and long-term care facility with 174 or more beds located at 505 Robert Boulevard in Slidell, Louisiana.

21.     At all times relevant to the Complaint, Defendant COMMCARE MANAGEMENT CORPORATION was an operator or managing entity of Greenbriar Community Care Center.

22.     At all times relevant to the Complaint, Greenbriar Community Care Center offered long-term care for prospective residents and is a dwelling within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h).

23.     At all times relevant to the complaint, Greenbriar Community Care Center and Defendants COMMCARE CORPORATION and COMMCARE MANAGEMENT CORPORATION engaged, at the facility, in a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

## Metairie Healthcare Center

24.	At all times relevant to the Complaint, Defendant METAIRIE OPERATIONS, L.L.C. was an owner and/or operator or managing entity of Metairie Healthcare Center, a long term care facility with 202 or more beds located at 6401 Riverside Drive in Metairie, Louisiana.

25.	At all times relevant to the Complaint, Defendant RONALD GOUX was an owner and an individual with operational or managerial control of Metairie Healthcare Center.

26.	At all times relevant to the Complaint, Defendant JEREMY GOUX was an owner of Metairie Healthcare Center.

27.	At all times relevant to the Complaint, Defendant TIMOTHY GOUX was an owner of Metairie Healthcare Center.

28.	At all times relevant to the Complaint, Metairie Healthcare Center offered long-term care for prospective residents and is a dwelling within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h).

29.	At all times relevant to the complaint, Metairie Healthcare Center and Defendant METAIRIE OPERATIONS, L.L.C., engaged in a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

### St. Luke's Living Center

30.	St. Luke's Living Center is a nursing home and assisted living facility offering long-term residences with 104 or more beds located at 4201 Woodland Drive in New Orleans, Louisiana.

31.	At all times relevant to the Complaint, Defendant ST. JUDE MANAGEMENT #2, L.L.C. was an owner and/or operator of St. Luke's Living Center.

32.	At all times relevant to the Complaint, Defendant LAWRENCE STANSBERRY was an owner and an individual with operational or managerial control of St. Luke's Living Center.

33.     At all times relevant to the Complaint, Defendant LUCY GARNER was an owner of St. Luke's Living Center.

34.     At all times relevant to the Complaint, Defendant WILLIAM GARNER was an owner of St. Luke's Living Center.

35.     At all times relevant to the Complaint, St. Luke's Living Center offered long-term care for prospective residents and is a dwelling within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h).

36.     At all times relevant to the complaint, St. Luke's Living Center and Defendant ST. JUDE'S MANAGEMENT #2, L.L.C., engaged in a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

## FACTUAL ALLEGATIONS

### Effective Communication for Deaf Individuals and the Adoption of Video Remote Interpreting

37.     "Effective communication" is critical to the health and wellbeing of occupants living in an Assisted Living Facility or Nursing Home, especially with regard to medical care. Without it, a caregiver cannot obtain complete medical histories; assess symptoms; provide for patient rights, including informed consent; develop accurate diagnoses and prognoses; develop, explain and administer procedures, medication and treatment generally; provide counseling; or otherwise ensure that residents' needs are appropriately met.

38.     American Sign Language ("ASL") is a visual, three-dimensional, non-linear language. Its grammar and syntax differ from the grammar and syntax of English and other spoken languages, and is considered a foreign language used by American deaf people. As a result of both physical and environmental factors, deaf individuals frequently have great difficulty achieving

command of spoken or written English.  However, deaf individuals are often able to communicate with great complexity in ASL.

39.    Lip-reading, the ability to understand the speech of another by watching the speaker's lips, is a speculative and ineffective means of communication.  Only a small amount of the spoken sounds of aural language are visible, and many of those appear identical on the lips.  According to the National Association for the Deaf, even the most skilled lipreaders understand only 25 percent of what is said to them, and many individuals understand far less.  Lip-reading is not an effective substitute for communication through a qualified ASL interpreter.

40.    Communication boards, devices that are used to assist those who have trouble verbally communicating, provide a limited means of communication.  They are boards or screens showing a number of words or symbols that a user will point to (or utilize other gestures) in order to communicate.  They are inadequate to communicate complex information to a native ASL speaker and are no substitute for communication through a qualified ASL interpreter.

41.    For these reasons, certified ASL interpreters are necessary for the great majority of deaf individuals receiving medical, nursing home, and assisted living and rehabilitation care when that care involves complicated information, lengthy communications, or when the individual has other conditions that make seeing or communicating through other means more difficult.

42.    In addition, ASL interpreters are necessary for the great majority of deaf individuals to have equal opportunity to the use, enjoyment, and benefit of housing provided by long-term nursing and assisted living facilities.

43.    During the last decade, with the availability of broadband internet, remote ASL interpreting services have become widely available as an auxiliary aid.  Video Remote Interpreting, or "VRI", enables facilities and individuals to access on-demand interpreters through an electronic

tablet or other electronic device.   With the development and widespread availability of VRI, facilities can provide ASL interpreters without relying on local in-person ASL interpreters, whose availability can present potential barriers to use.

### The Defendants' Receipt of Federal Financial Assistance with Attached Non-Discrimination Mandates

44.     During all times relevant to the Complaint, Defendants Plantation Management Company, L.L.C., St. Joseph of Harahan, L.L.C., Highpoint Healthcare LLC, Medico, L.L.C., Notre Dame Health System, CommCare Corporation, CommCare Management Corporation, Metairie Operations, L.L.C., and St. Jude Management #2, L.L.C. (collectively, "Corporate Defendants") received substantial Federal financial assistance, including Medicare and/or Medicaid grants and/or reimbursements, for operations, activities and services Defendants engaged at the facilities set forth in this complaint.

45.     Both the Rehabilitation Act and Affordable Care Act ("ACA") Section 1557 prohibit discrimination or denial of benefits due to disability on the part of entities receiving federal financial assistance.

46.     On information and belief, agents of Corporate Defendants, as a condition of receipt of Federal financial assistance in connection with the operation of the facilities set forth in this complaint, signed and filed an Assurance of Compliance with the United States Department of Health and Human Services in which the agents attested that the facility operators would comply with (a) the Rehabilitation Act and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 84) and (2) Section 1557 of the ACA and all requirements imposed by or pursuant to the Regulation of the Department of Health and Human Services (45 C.F.R. Part 92).

47.     At all times relevant to the complaint, pursuant to Federal regulations implementing Section 1557 of ACA, health-related facilities receiving Federal financial assistance are required to "take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities" and "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity…." 45 C.F.R. § 92.202(a); 28 C.F.R. § 35.160(b)(1).

48.     Pursuant to Federal regulations implementing Section 504 of the Rehabilitation Act, facilities receiving Federal financial assistance "must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs" and "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question…." 45 C.F.R. § 84.4(b)(2); 45 C.F.R. § 84.52(d).

## The Testing Investigation

49.     LaFHAC became aware that housing discrimination against deaf individuals in assisted living facilities and nursing homes had been documented in other parts of the country and may be occurring in Louisiana.

50.     In response, LaFHAC initiated a testing investigation of Louisiana Nursing Homes and Assisted Living Facilities to determine their practices with regard to accommodating deaf and hard of hearing individuals who communicated through ASL.

51.     LaFHAC trained the testers who performed the tests described herein to make inquiries on behalf of an elderly deaf relative regarding the facility's services, policies, and willingness and ability to provide auxiliary aids for deaf individuals.

52.     The initial testing involved sixty facilities, and the investigation determined that sixty-eight percent (68%) of those facilities would not provide an ASL interpreter to a deaf individual under any circumstances.

53.     In 2018, LaFHAC engaged in additional testing ("Phase 2") in which it re-tested providers who had refused to provide interpreter services in Phase 1, and also some providers who had not yet been investigated.  Since the time from the first phase of the investigation, the healthcare industry had begun widespread adoption of video remote interpreting (VRI) as a practical and effective auxiliary aid to enable communication with deaf individuals.

54.     The tester designated to undertake the Phase 2 tests was trained to make inquiries on behalf of an elderly deaf relative regarding the facility's services, policies, and willingness and ability to provide auxiliary aids, including a specific request whether VRI could be provided for the prospective deaf resident when on-site interpreters were not available.

55.     The Phase 2 testing identified twelve facilities that, notwithstanding widespread adoption in the medical and caregiving industries by 2018, would not provide in-person ASL interpretation or VRI as an auxiliary aid to a deaf individual and would not offer anything more than a communication board or written message system.

56.     A number of facilities that were tested in Phase 2 had, in fact, either adopted VRI or would be willing to do so for a deaf resident.

57.     The five facilities identified in this Complaint were among the facilities identified in the Phase 2 testing as refusing to provide auxiliary aid or services, including VRI.

58.     In July 2020, to confirm the discriminatory practices previously found, LaFHAC engaged in further testing ("Phase 3") of the twelve facilities that had refused to provide in-person ASL interpretation or VRI in the Phase 2 testing.  The testing allowed for almost two additional years for the facilities to adopt or at least entertain the provision of the widespread, practical, and cost-effective VRI method to allow for communication with deaf residents or prospective residents.

59.     A number of those twelve facilities had, in fact, adopted VRI or would be willing to do so for a deaf resident.

60.     St. Joseph of Harahan, Chateau de Notre Dame, Greenbriar Community Care Center, Metairie Healthcare Center, and St. Luke's Living Center refused to provide in-person or VRI-assisted ASL interpretation during the Phase 3 testing.

61.     The employees of these facilities (St. Joseph of Harahan, Chateau de Notre Dame, Greenbriar Community Care Center, Metairie Healthcare Center, and St. Luke's Living Center) who interacted with the testers as detailed in the allegations below, as well as any decision-makers or other employees referenced during the testing calls, were agents acting on behalf of the owners, operators, and managing entities of the specific facility at which they were employed.

### Testing of St. Joseph of Harahan

### Phase 1 Testing

62.     On December 16, 2016, Tester M.R. contacted an individual who identified himself as Mack in the Admissions Department of St. Joseph of Harahan.  M.R. said he was calling to inquire about long-term placement for his deaf grandmother.

63.     M.R. told Mack that his grandmother was deaf from birth and communicated only through ASL, and he asked what kind of services would be offered for her.

64.     Mack said that the facility did not have anyone who spoke sign language and that the only means of communication would be with "sign boards" where she would "point back and forth to words and that sort of thing."

65.     M.R. said his family's main concern was whether his grandmother would be able to communicate with someone on staff and asked if there could be any kind of accommodation or exception by having an interpreter on call or be able to respond to his grandmother.  Matt said he would check with the decisionmakers and call M.R. back.

66.     A few days later, on December 20, 2016, M.R. called the facility and asked for Mack.  The woman who took the call said she could field M.R.'s questions.  M.R. asked if the facility had made a decision regarding an accommodation of interpreter services, and the woman said she would have to check with an administrator.  She said she would call him back and took down his information.

67.     M.R. did not receive a call back.  On March 20, 2017, M.R. called the facility back and spoke with Kim in Admissions.  M.R. asked if the facility would provide interpreter services, and Kim responded, "we don't have any one here that signs."  M.R. asked, were his grandmother admitted, if the facility could make an exception and secure a part-time interpreter when communication was required.  Kim responded that "we would be highly reluctant to take a patient we can't communicate with."  Kim suggested he call a social agency for the deaf and ask for recommendations for suitable facilities.  When M.R. asked again if they could provide interpreter services, Kim said that the facility could not provide them for his grandmother.

### Phase 2 Testing

68.     On January 17, 2019, Tester E.G. called St. Joseph of Harahan and spoke with a Katie in Admissions.

13

69.     E.G. asked what services would be available for her grandmother, whom she identified as deaf since birth and using ASL. E.G. asked what the facility's accommodations would be for a deaf individual.

70.     Katie said that the facility had a communication binder but was unaware if any staff spoke sign.

71.     E.G. asked if the facility would explore or could provide an interpreter or video remote interpreting (VRI). Katie stated she had not heard of VRI but would check whether it could be provided and call E.G. back within a few days.

72.     E.G. did not receive a call back. She called the facility again on January 22 and asked to speak to Katie. E.G. was told that Katie was unavailable and should leave a message. E.G. asked to be contacted back.

73.     On January 23, in response to a missed call, E.G. called the facility. She spoke to Kim in admissions. E.G. explained that she had spoken to Katie, and Kim responded, "you had asked her about doing a specialty, something special.…"

74.     E.G. told Kim that she was calling on behalf of her deaf grandmother and asking about accommodations for people who are deaf. Kim responded, "[Katie] said something, there was something about a tablet, something like that and we cannot do that. We do boards, you know, and notebooks, things like that. Communication boards, notebooks and pens, where she could write what she needs if we can't figure it out, that kind of stuff. But we don't do whatever it is you were asking Katie to do."

75.     E.G. confirmed that there is nothing that could be provided other than boards and notebooks, and Kim responded, "not that I'm aware of."

**Phase 3 Testing**

14

76.     On June 15, 2020, Tester L.W. called St. Joseph of Harahan and asked to speak to the Admissions Department.

77.     L.W. spoke to a woman who identified herself as Clochelle in Admissions and asked about what services were available for the deaf.  The woman said that the facility "could do a communication board."

78.     L.W. asked there was anyone on staff who spoke sign, and the woman said there was not.

79.     L.W. then asked about video interpretation services, and she was told, "we don't provide that."

80.     On information and belief, the woman with whom L.W. spoke had knowledge and discretion to advise L.W. regarding the facility's policies for deaf individuals, including with respect to available auxiliary aids.

81.     At the time of Phase 3 testing, St. Joseph of Harahan had a Non-Discrimination Statement on its website.  The Statement provided,

> **St. Joseph of Harahan** complies with applicable Federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, or sex. Nor will we exclude people or treat them differently because of race, color, national origin, age, disability, or sex.
>
> As part of this commitment:
>
> We provide free aids and services to people with disabilities to communicate effectively with us. For example, this includes:
>
> Qualified sign language interpreters, and
> Written information in other formats, such as large print, audio, and online.

### The Testing of Chateau de Notre Dame

### Phase 1 Testing

82.    On January 11, 2017, Tester M.R. contacted Chateau de Notre Dame and spoke to a representative, Ella, about what services would be available for her grandmother, whom the tester identified as deaf with ASL as her first language. Ella said that "there's absolutely no one here who speaks sign language."

83.    The tester asked if an accommodation could be made for her grandmother to have an interpreter available when needed. Ella responded, "No, I don't think that would be an option, I can ask the administrator but I know that they don't just hire special people. What happens is we have to be able to take care of the patient with the staff who is current."

84.    M.R. requested Ella to call her back if there was an option to have any interpretation services. Ella did not contact M.R. subsequently.

**Phase 2 Testing**

85.    On August 17, 2018, Tester E.G. contacted Chateau de Notre Dame and reached a woman named Janis in the Admissions Department.

86.    E.G. told Janis that she was calling on behalf of her grandmother, whom the tester identified as deaf since birth and communicating with ASL as her first language, and asked what accommodations would be available for a deaf individual.

87.    On information and belief, Janis had knowledge and discretion to advise E.G. regarding the facility's policies for deaf individuals, including with respect to available auxiliary aids.

88.    Janis said that there was no one on staff who spoke sign language, and asked if E.G.'s grandmother could see pictures and point. E.G. responded that another facility had used VRI when no interpreters were available and asked if Janis were familiar with VRI.

16

89.     Janis said she was not familiar, and E.G. explained VRI to Janis and requested whether the facility would consider providing it.  Janis said she would have to check with her administrator.

90.     E.G. followed up with Chateau de Notre Dame one week later, on August 24, and again spoke to Janis.

91.     E.G. asked if Janis had spoken with her administrator about providing VRI, and Janis said, "No, they said they wouldn't be able to get that."  Janis said there was a therapeutic board used in therapy that could be made available, but VRI was not something the facility would provide.

### Phase 3 Testing

92.     On June 15, 2020, Tester L.W. called Chateau de Notre Dame and spoke to Sandy in the Admissions Department.  L.W. asked what services were available for patients who are deaf, identifying her mother as the person for whom she sought services.  Sandy said she would determine what the facility could provide and call back.

93.     L.W. did not hear back, and on June 18, L.W. left a voicemail with Sandy asking what accommodations, if any, might be available for her deaf mother.

94.     On June 22, L.W. had a phone conversation with Sandy.  Sandy said no one on staff spoke sign, so she needed more information regarding the prospective resident's needs and asked what accommodations might be needed.  L.W. responded that an accommodation of interpretation services through VRI would be suitable, such as in situations where her mother was experience pain or other medical conditions in which the need to communicate would be pressing.

95.     Sandy said that that service is not provided at this time (and asked if there were a fee for such interpretation service), but said she would check with an administrator.

96.   On June 23, Sandy left a voicemail for L.W. and said, "I am returning your call from yesterday afternoon when we talked about video interpretation service.  We will not pay for that. If your Mom has iPad, you can download app, we can instruct staff to use it."

## The Testing of Greenbriar Community Care Center

### Phase 1 Testing

97.   On January 11, 2017, Tester M.R. contacted Greenbriar Community Care Center and spoke to a representative, Jackie, about whether there were any services available for his grandmother, whom the tester identified as deaf with ASL as her first language.

98.   The representative responded, "Unfortunately we do not. We're working on that, to be able to provide the services right now. We're actually looking into the school for some of our staff to take. But right now I cannot provide those services."

### Phase 2 Testing

99.   On August 17, 2018, Tester E.G. called Greenbriar Community Care Center and spoke with a representative, Alysa, who identified herself as the Admissions Coordinator.

100.   E.G. inquired into accommodations for her grandmother, whom she identified as born deaf.

101.   Alysa stated that they had various room types and did have residents with hard of hearing handicaps.  E.G. then inquired "specifically about interpreting services, like VRI," and Alysa said, "we don't have anything like that."

102.   E.G. asked if Alysa was familiar with VRI, and Alysa said she was not.  E.G. explained VRI, and Alysa said she would need to check with an administrator to see if that were "something our administer would be interested in."  Alysa took E.G.'s information and said the Administrator would call her back.

18

103.    No one called E.G. back.

104.    E.G. called the facility again one week later, on August 24, 2018.  E.G. reached Denise, who identified herself as "the administrator."  Denise asked about E.G.'s grandmother, and E.G. explained that she was born deaf, spoke ASL as her first language, and required interpretation services to communicate.  E.G. explained that her grandmother's current facility had been using VRI.  E.G. then explained VRI to Denise.

105.    Denise said she had never heard of VRI.  E.G. asked Denise if the facility would be able to provide the service for her grandmother.  Denise said she would need "to do some research" and "see if it is something they think we can do."  Denise said she would call E.G. after finding out.

106.    During E.G.'s explanation of VRI, Denise acknowledged that a deaf person's pointing at pictures to communicate is something "which is very limiting."

107.    E.G. called Denise five days later, on August 29, and Denise mentioned that her supervisor had never heard of VRI.  Denise said she did not yet have an answer for E.G.

108.    Over a week passed, and E.G. had not heard back from Denise.  On September 7, E.G. called in both in the morning and in the afternoon, leaving messages with the representative requesting a call back from Denise.

109.    E.G. contacted the facility again on September 10 and was able to speak to Denise. Denise said that she had spoken to her Regional Director and "had looked into this [VRI]."  Denise said, "I don't see how we're able to do it."  She said "even though we can get the [VRI] app, every CNA, I would have to make sure every person in the room would have to have some type of device, and I just don't have that set up."  She added that "we are in the middle of redoing our new building

19

and switching how we do things, and I think we have enough changes going on right now that I can't implement this."

**Phase 3 Testing**

110.   On June 15, 2020, Tester L.W. called Greenbriar Community Care Center and spoke to Lauren Lee, who identified herself as Director of Marketing.  L.W. asked what services were available for the deaf, and what accommodations would be available for her deaf mother who was looking for long-term care.

111.   Ms. Lee said that the facility would be able to use a communications board, but currently there is no one who speaks ASL and they had no assisted devices, although the facility could look into getting such a device.

112.   L.W. asked about VRI services, explaining how it worked, and Ms. Lee said she was not familiar with it but could look into it and give L.W. a call back.  L.W. requested a call back and gave her contact information.

113.   L.W. did not hear back from Ms. Lee.  Over the course of the next three weeks – on June 18, June 22, June 24,  June 26,  July 2, and July 6 – L.W. left messages for Ms. Lee.  In the messages, L.W. said that she was asking about accommodations for her deaf grandmother and whether the facility could provide video interpretation services.

114.   On July 7, Ms. Lee left a voicemail for L.W.  Ms. Lee said that "in regard to the services we have for those who are hearing-impaired, I did get clarification on that, and what we have used is the communication board."

**The Testing of Metairie Healthcare Center**

**Phase 2 Testing**

20

115. On August 17, 2018, Tester E.G. called Metairie Healthcare Center and spoke with Tiffany after asking to speak to someone in Admissions.

116. E.G. said she was calling regarding a place for her grandmother, whom she identified as born deaf and unable to communicate without an ASL interpreter, and asked about what kind of accommodations or assistance was available for deaf individuals.

117. Tiffany said that the facility had a chalk or message board, but no one that signs. E.G. then explained VRI to Tiffany (who had not heard of the auxiliary aid) and asked whether the facility would be open to exploring having VRI for her grandmother. Tiffany said she would check with her administrator and call E.G. back.

118. E.G. did not hear back from any representative, so she called the facility back eleven days later, on August 28, 2018. E.G. spoke with Tiffany and asked if the facility had made a conclusion whether to accommodate her grandmother with VRI. Tiffany asked if E.G.'s grandmother had the equipment already, and E.G. responded that she did not. Tiffany responded: "my administrator says no, not at this time."

### Phase 3 Testing

119. On June 15, 2020, Tester L.W. called Metairie Healthcare Center and spoke to Daphne Leblanc in Admissions. L.W. said she was calling regarding her mother, who was deaf, and asked what services were available for deaf individuals.

120. Ms. Leblanc said that they did not have an interpreter and typically used communication boards.

121. L.W. asked whether VRI was available. Ms. Leblanc responded that "usually the family provides that" and the facility would be able provide it if the family pays for it.

### Testing of St. Luke's Living Center

**Phase 1 Testing**

122.    On January 10, 2017, Tester M.R. contacted Holly in the Admissions Department of St. Luke's Living Center.  He said he was calling to inquire about long-term placement for his deaf grandmother.

123.    M.R. told Holly that his grandmother was deaf from birth and communicated only through ASL, and he asked what kind of services would be offered for her.

124.    Holly put M.R. on hold while she verified some information.

125.    When she returned to the call, Holly said, "we would be unable to meet her needs because we have no one on staff to interpret what she is saying."

126.    M.R. asked if the facility would be able to make an exception, such as hiring a certified interpreter to meet her needs.

127.    Holly suggested that M.R. contacted St. Luke's sister facility, St. Margaret's of Mercy.

128.    When further pressed by M.R. whether ASL interpretive services could be made available, Holly stated, "I know right now at this present time we can't offer that."

**Phase 2 Testing**

129.    On January 9, 2019, Tester E.G. called St. Luke's Living Center and spoke with Janis in the Admissions Department.

130.    E.G. asked what services would be available for her grandmother, whom she identified as born deaf, using ASL, and unable to communicate without an interpreter.  E.G. asked what the facility's accommodations would be for a deaf individual.

131.    Janis said, "we don't have anyone that signs.  Did you try St. Margaret's [of Mercy, the sister facility]?"  Janis also said that St. Margaret's had computer-assisted technology for deaf individuals.

132.    E.G. asked Janis whether St. Luke's would provide Video Remote Interpreting for E.G.'s grandmother.  Janis said she would call E.G. back, and E.G. provided her contact information.

133.    On January 21, E.G. contacted Janis and asked what accommodations the facility could offer her deaf grandmother.  Janis said, "what they actually said is that they could give her like a board where she could point to things or maybe spell things out, but outside of that there aren't many accommodations here."

134.    E.G. asked Janis if her statement meant that no VRI services or anything similar would be provided.  Janis responded that they did not have internet at the nursing stations and she did not know how it would work, and also said "it might be a difficult thing just because everyone is unfamiliar."

135.    Janis confirmed that the only accommodation would be a white board that E.G.'s grandmother could point out things.

## Phase 3 Testing

136.    On June 18, 2020, Tester L.W. contacted St Luke's Living Center and spoke with Kelly in the Admissions Department.

137.    L.W. said she was looking for a long-term care for her mother, whom she identified as born deaf and speaks sign language, and asked about services available for deaf residents.  Kelly said there were no specific programs for deaf residents and no one on staff that speaks sign language.

23

138. LW. asked if the facility had used video interpreter services and would be able to use them. Kelly said they had not used those services but she would ask her C.O.O. (Alec Lundberg) whether the facility was capable of providing the services for L.W.'s mother.

139. The next day, on June 19, Kelly called and left a voicemail with L.W. Kelly said that she had spoken with the C.F.O. and that if L.W. brought in the equipment and paid for the interpreter service, the facility would be able to set it up with their internet service provider. Kelly stated in the voicemail, "we wouldn't be able purchase the interpreter service."

140. L.W. returned the call and spoke with a woman named Kiana in the Admissions Department. Kiana confirmed that if L.W.'s mother has the equipment, then she can use the interpreter services. Kiana said that Kelly was the one who had knowledge of whether the facility would pay for the interpreter services.

### LaFHAC's Injury
### Diversion of Investigative Resources

141. LaFHAC's efforts in furtherance of its mission have been directly harmed by Defendants' discrimination against individuals on the basis of disability.

142. LaFHAC has dedicated significant resources to identifying and counteracting the effects of Defendants' discrimination.

143. With regard to identifying the Defendants' discriminatory conduct, LaFHAC undertook an extensive follow-up testing investigation after its initial investigation in 2016-17 found a widespread refusal on the part of the state's Nursing Homes and Assisted Living Facilities to provide necessary interpreter services to deaf residents and prospective residents.

144. This 2018-19 Phase 2 investigation identified Defendants as facilities that either refused to provide VRI outright or would only provide it if the resident bore the cost, in contravention of applicable law and regulations.

24

145.    In 2020, LaFHAC undertook a final testing investigation of the facilities that had been identified in the follow-up investigation as engaging in discriminatory practices or maintaining a discriminatory policy with regard to auxiliary aids.  This Phase 3 investigation confirmed that Defendants continued to refuse to provide VRI to prospective deaf residents.

146.    The Phase 2 and 3 testing of the Defendants involved the commitment of significant time and resources.  LaFHAC's Coordinator of Investigations, in addition to developing the overall testing protocol and training the testers, coordinated the specific tests involving the Defendants and recorded the results of the numerous calls.

147.    In order to undertake the testing, LaFHAC diverted its investigative resources from other projects and activities in furtherance of its mission.  The diversion of resources occasioned by the Defendants' discriminatory conduct impaired or impeded these projects and activities.

### Diversion of Education and Outreach Resources

148.    LaFHAC also undertook extensive education and outreach activities to counteract the effects of Defendants' discrimination.  The education and outreach activities are ongoing.

149.    The education and outreach activities include the creation and circulation of materials addressing discrimination against deaf individuals in Nursing Homes and Assisted Living Facilities, such as:

    a.  Creating an informational video and distributing it through social media.

    b.  Creating and distributing written materials addressing the discrimination.

    c.  Seeking out and working with partner organizations to reach individuals most likely to be affected by the discrimination and inform them of their rights under non-discrimination laws.

150. As a result of these counteraction efforts, which LaFHAC made specifically in response to Defendants' conduct as alleged herein, LaFHAC has diverted its resources away from other planned projects and activities in furtherance of its mission. Those planned projects and activities included fair housing landlord trainings, LaFHAC's annual fair housing conference, Fair Housing Month events and event planning, fundraising campaigns, promotional work regarding LaFHAC's "Fair Housing Five" children's book, and other projects and activities. The diversion of resources occasioned by the Defendants' discriminatory conduct impaired or impeded these projects and activities.

151. Defendants' actions have also frustrated the mission and purpose of LaFHAC. As described above, LaFHAC's mission is to ensure equal housing opportunity in Louisiana and to fight unlawful discrimination. Defendants' discrimination against people with disabilities directly impedes LaFHAC's efforts and frustrates its mission.

## COUNT I

## VIOLATIONS OF THE FAIR HOUSING ACT

(All Defendants)

152. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

153. Defendants own and lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

154. Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, polices, practices, or services, when such accommodations may be

necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

155.   By the conduct set forth in paragraphs 60-140 above, Defendants discriminated in the rental of dwelling and made a dwelling unavailable on the basis of disability, in violation of 42 U.S.C. § 3604(a) and 24 C.F.R. § 100.60(a).

156.   By the conduct set forth in paragraphs 60-140 above, Defendants discriminated in the terms, conditions or privileges of the rental of a dwelling, or in the provision of services or facilities in connection therewith, on the basis of disability, in violation of 42 U.S.C. § 3604(f)(2); and 24 C.F.R. § 100.65(a).

157.   By the conduct set forth in paragraphs 60-140 above, Defendants refused to make reasonable accommodations in rules, policies, practices or services, when such accommodation may be necessary to afford such a person equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B) and 24 C.F.R. § 100.204 (b).

158.   On information and belief, the conduct in violation of the FHA alleged above was the result of an enduring and ongoing policy or practice of each Defendant, which continues today, to deny the use of qualified ASL interpreters via VRI or other means without regard to whether other methods would provide effective communication.

159.   With respect to the conduct in violation of the FHA alleged above, each Defendant acted with willful disregard, malice, or reckless indifference that its actions violated the Fair Housing Act.

160.   Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured by the Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission, as a result.

161. Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT II

## VIOLATIONS OF THE REHABILITATION ACT

(Defendants Plantation Management Company, L.L.C., St. Joseph of Harahan, L.L.C., Highpoint Healthcare LLC, Medico, L.L.C., Notre Dame Health System, CommCare Corporation, CommCare Management Corporation, Metairie Operations, L.L.C., and St. Jude Management #2, L.L.C.)

162. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

163. Corporate Defendants' actions set forth in paragraphs 60-140 above constitute discrimination, solely on the basis of disability, by denying meaningful access to the services, programs, and benefits the Defendants offer to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure effective communication, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and enabling Regulations at 45 C.F.R. Part 84.

164. Plaintiff is an aggrieved person as defined by Section 794a(a)(2) of the Rehabilitation Act, has been injured by the Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission, as a result.

165. On information and belief, the conduct in violation of the Rehabilitation Act alleged above was the result of an enduring and ongoing policy or practice of each Defendant, which continues today, to deny the use of qualified ASL interpreters via VRI or other means without regard to whether other methods would provide effective communication.

166. With respect to the conduct in violation of the Rehabilitation Act alleged above, each Defendant acted with the intent to discriminate.

167.    Accordingly, Plaintiff is entitled to actual damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT III

## VIOLATIONS OF SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

(Defendants Plantation Management Company, L.L.C., St. Joseph of Harahan, L.L.C., Highpoint Healthcare LLC, Medico, L.L.C., Notre Dame Health System, CommCare Corporation, CommCare Management Corporation, Metairie Operations, L.L.C., and St. Jude Management #2, L.L.C.)

168.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

169.    Corporate Defendants' actions set forth in paragraphs 60-140 above constitute discrimination and exclusion, solely on the basis of disability, by denying meaningful access to the health programs or activities that Defendants offer to other individuals and by refusing to provide auxiliary aids and services necessary to ensure effective communication, in violation of 42 U.S.C. § 18116 and enabling Regulations set forth at 45 C.F.R. part 92.

170.    Plaintiff is an aggrieved person as defined by Section 18116 (by reference to the Rehabilitation Act), has been injured by the Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission, as a result.

171.    On information and belief, the conduct in violation of Section 1557 alleged above was the result of an enduring and ongoing policy or practice of each Defendant, which continues today, to deny the use of qualified ASL interpreters via VRI or other means without regard to whether other methods would provide effective communication.

172.    With respect to the conduct in violation of Section 1557 alleged above, each Defendant acted with the intent to discriminate.

173.    Accordingly, Plaintiff is entitled to actual damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT IV

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

(All Defendants)

174.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

175.    Defendants own, lease, and/or operate a place of public accommodation within the meaning of 42 U.S.C. § 12181(7)(F).

176.    Defendants' actions set forth in paragraphs 60-140 above constitute discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations in violation of 42 U.S.C. § 12181(a) and enabling Regulations set forth at 28 C.F.R. part 36.

177.    By Defendants' actions set forth in paragraphs 59-138 above, Defendants excluded or otherwise denied equal goods, services, facilities, privileges, advantages, or accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association in violation of 42 U.S.C. § 12181(b)(1)(E) and enabling regulations set forth at 28 C.F.R. part 36.

178.    On information and belief, the conduct in violation of the ADA alleged above was the result of an enduring and ongoing policy or practice of each Defendant, which continues today, to deny the use of qualified ASL interpreters via VRI or other means without regard to whether other methods would provide effective communication.

179.     As set forth above, absent injunctive relief there is a clear risk that Defendants' actions will continue to occur and continue to frustrate Plaintiff's mission.

180.     Accordingly, Plaintiff is entitled to injunctive relief and reasonable attorneys' fees and costs.

## COUNT V

## NEGLIGENT SUPERVISION AND TRAINING UNDER LOUISIANA LAW

(All Defendants)

181.     Under Louisiana law, Defendants had a duty to avoid causing injury and harm through negligent supervision and training of their agents and employees.

182.     Under Louisiana law, Defendants were negligent in the supervision and training of their employees and/or agents insofar as the supervision and training lapses provided Defendant's employees/agents with an opportunity to violate federal anti-discrimination laws.  These lapses were the proximate cause of foreseeable injury to Plaintiff.

183.     Upon information and belief, Defendants provided its employees/agent with no training or inadequate training related to reasonable accommodation requests, methods of effective communication or auxiliary aids for deaf individuals, and obligations arising under anti-discrimination laws.

184.     By and through the actions of its employees/agents, Defendants breached their duty to LaFHAC.

185.     But for the actions of Defendants and their employees/agents, LaFHAC would not have suffered the injuries and damages that are at issue in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court award the following relief:

31

A.      Enter a declaratory judgment that the discriminatory conduct of Defendants set forth above violated the Fair Housing Act, Rehabilitation Act, Section 1557 of the Patient Protection and Affordable Care Act; and the Americans with Disabilities Act,

B.      Enter an injunction against Defendants, their agents, employees, successors, and all other persons in active concert or participation with them that:

1.  enjoins Defendants from discriminating on the basis of disability in violation of the Fair Housing Act, Rehabilitation Act, Section 1557 of the Patient Protection and Affordable Care Act, and the Americans with Disabilities Act;

2.  enjoins them from implementing or enforcing any policy, procedure, or practice that denies deaf individuals meaningful access to and full and equal enjoyment of Defendants' facilities, services or programs;

3.  orders them to take affirmative steps to prevent the recurrence of discriminatory conduct in the future, such as training, implementation of non-discrimination policies and procedures, reporting requirements, and any other steps that may be necessary;

4.  orders them to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an ASL interpreter for effective communication, a certified ASL interpreter will be provided as soon as practicable in all services offered by Defendants;

5.  orders them to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting

explicit and clearly worded notices that Defendants will provide certified ASL interpreters to ensure effective communication with deaf or hard of hearing persons;

6. orders them to train all their employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the Fair Housing Act, Rehabilitation Act, Section 1557 of the Patient Protection and Affordable Care Act, and the Americans with Disabilities Act;

7. orders them to train all their employees, staff, and other agents on a regular basis about Defendants' policy regarding how to obtain certified ASL interpreters when reasonably requested by deaf or hard of hearing individuals;

C. Award Plaintiff compensatory damages;

D. Award Plaintiff punitive damages that would punish Defendants for the willful, malicious, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

E. Award Plaintiff its reasonable attorneys' fees and costs incurred in this action; and

F. Award any additional relief that is just and proper.

Dated: June 1, 2021

Respectfully Submitted,

*/s/ Peter F. Theis*
Peter Franklin Theis (La. Bar No. 34786)
LOUISIANA FAIR HOUSING
ACTION CENTER, INC.
1340 Poydras Street, Suite 710

33

New Orleans, LA 70112
Tel: (504) 208-5070
Fax: (504) 434-4365
Email: ptheis@lafairhousing.org

***Counsel for Plaintiff***